## DEMURRAGE CHARGES ON CARS BUNCHED BY REASON OF INTENSE COLD AND HEAVY SNOW.

Court of Common Pleas for Cuyahoga County.

WALKER D. HINES, DIRECTOR GENERAL OF RAILROADS, v. THE ANTHONY CARLIN COMPANY, A CORPORATION.

Decided, April 9, 1921.

*Jurisdiction in Matters of Railroad Demurrage—Bunching of Cars by Reason of Intense Cold and Heavy Snow—Not an Act of God—Binding Effect of Interstate Commerce Rulings—Character of Events Falling Within the Class known as Acts of God.*

1. State courts have no authority to exercise jurisdiction over subjects which come primarily within the jurisdiction of the Interstate Commerce Commission.

2. Where the shipment is interstate, and the tariff rules make no provision for additional free time for car detention on account of bunching, resulting from an act of God, the claim of a consignee bound under the "average agreement" rule for demurrage charges, that he is entitled to additional free time by reason of such agreement, is within the exclusive jurisdiction of the Interstate Commerce Commission.

3. The fact alone that the bunching of cars was wholly due to conditions created by heavy snowfall, severe storms and protracted and intensely cold weather, is not sufficient to show that such bunching was the result of an act of God.

*Tolles, Hogsett, Ginn & Morley,* for plaintiff.

*Henderson, Quail, Siddall & Morgan,* for defendant.

KRAMER, J.

This is an action brought to collect certain demurrage charges which the plaintiff alleges accrued against the defendant, in February, 1918.

The case is submitted upon an agreed statement of facts, excepting that some evidence was taken upon the issue of the amount of the accrued demurrage. The uncontroverted evidence shows that notice was duly mailed to the defendant on the afternoon of Feb. 12th, which was received by it on the morning of Feb. 13th. The demurrage would, therefore, begin to run from Feb. 13th, 1918, as claimed by the plaintiff; so that, if the plaintiff is entitled to recover, he is entitled to recover in the sum of $1,013.52, with interest.

The agreed statement of facts is as follows:

"It is stipulated by and between counsel for the respective parties, that during the periods involved in this controversy, Walker D. Hines was the duly apponted, qualified and acting Director General of Railroads, and with his predecessor, Wm. G. McAdoo, was in control and possession of the New York, Chicago & St. Louis Railroad Company, since Jan. 1, 1918, pursuant to proclamation of the President, of Dec. 26, 1917, in accordance with an Act of Congress dated Aug. 29, 1917.

"That The Anthony Carlin Company is successor to the Standard Foundry & Manufacturng Company, and also to the foundry business conducted by Anthony Carlin, and as successor has succeeded to all the rights and all the obligations of said the Standard Foundry & Manufacturing Company, and of the said business conducted by Anthony Carlin.

"That the New York, Chicago & St. Louis Railroad Company, prior to federal control, and this plaintiff, since federal control, has from time to time filed with the Interstate Commerce Commission and Public Utilities Commission of Ohio, freight tariffs providing rules and regulations covering car demurrage at all stations on the lines of railroad operated and owned by the New York, Chicago & St. Louis Railroad Company and the plaintiff herein, as required by the laws of the United States and the laws of the state of Ohio.

"That, as provided by law, such tariff charges are and were the only legal charges applicable for the detention of cars; that the tariff in force during the period hereinafter complained of was the New York, Chicago & St. Louis Railroad Company G. F. D. No. 112-J; that the tariff in force and effect in January, 1914, as well as the one above set forth, together with intermediate provided that the consignee might sign a written agreement with the carrier, known as an average agreement; and when so signed. demurrage should be computed in accordance with the provisions of the demurrage tariff then in force and effect, as governed by said average agreement.

"That on or about Jan. 1, 1914, the defendant's predecessor, the Standard Foundry & Manufacturing Company, duly signed the average agreement provided for in said tariff, which agreement was subsequently accepted and approved by the New York, Chicago & St. Louis Railroad Company, and that such average agreement and demurrage tariffs were in full force and effect during the period involved in this controversy.

"That if the plaintiff is entitled to recover in this case, it is

agreed that the amount thereof is the sum of $1,013.52, provided the court finds that there was a constructive placement of the cars consigned to the defendant, and the subject of this controversy, on Feb. 12, 1918. It is agreed that if the defendant is indebted to the plaintiff herein, the sum which he is entitled to recover in this case is $871.38, provided the court finds that there was a constructive placement of these cars in question on February 13, 1918.

"It is further stipulated and agreed that all of said cars referred to in this action, on which demurrage is sought to be recovered by the plaintiff, were bunched in transit or at destination, and were offered by the plaintiff to the defendant in accumulated numbers in excess of daily shipments, but the said bunching did not occur through any act or neglect of any railroad connected with the shipment or moving of said cars, including the New York, Chicago & St. Louis Railroad Company, the same having been caused wholly by conditions created by the heavy snowfall, severe storms and protracted intensely cold weather in the latter part of 1917, and in January and February of 1918, and the confusion and delay of traffic incident thereto, and to the results thereof.

"The demurrage charges herein sued on arose wholly from said bunching of cars, and were not to any degree caused by any failure or negligence of the defendant.

"That the cars for the detention of which the plaintiff's claim arose, all were consigned to and moved to the defendant herein, from points outside the state of Ohio.

"That the jury is hereby waived by counsel for both parties herein, and the issues of fact and law submitted to the court."

The correctness of the claim of the plaintiff for demurrage, in some amount, is not controverted by the defendant. Its claim is that no demurrage was properly chargeable against it, for the reason that the bunching of cars at its switch, which prevented it from unloading during the time for which this demurrage charge is assessed, was "caused wholly by conditions created by the heavy snowfall, severe storms and protracted, intensely cold weather, in the latter part of 1917, and in January and February of 1918, and the confusion and delay of traffic incident thereto, and to the results thereof." (See agreed statement of facts).

In support of this contention, defendant relies upon the case

of *Joslin-Schmidt Company* v. *Baltimore & Oho Southwestern Railroad Co.*, 25 C. C. (N. S.) 379, decided Feb. 28, 1916. A motion to require the Court of Appeals to certify its record was overruled, May 29, 1916. That case holds:

"Consignees who are bound under the 'average agreement' rule for demurrage charges on cars constructively delivered, notwithstanding the 'bunching' of such cars, are relieved therefrom where the bunching was not due to the act or neglect of some railroad company, but was wholly due to conditions prevailing during a great flood."

The agreed statement of facts, upon which the Joslin-Schmidt case was submitted, is the same as those stipulated herein, with two exceptions: first, in that case it does not appear whether the shipment was intrastate or interstate; in this, it is stipulated to be interstate. Second, the cause of the bunching was a flood in the Ohio and Miami valley, which the court says "has been many times held to have been 'an act of God,' and, in the absence of any stipulation that it was, we are inclined to think the courts in the Ohio and Miami valleys might take judicial notice to that effect."

In the case at bar, the stipulation is that the bunching was caused "wholly by conditions created by the heavy snowfall, severe storms and protracted, intensely cold weather, in the latter part of 1917, and in January and February of 1918."

The plaintiff maintains (1) that this court has no jurisdiction to determine the defense so made; that the defense involves an interpretation of the railroad tariffs, and is therefore within the exclusive jurisdiction of the Interstate Commerce Commission; (2) that the bunching herein was not caused by an "Act of God."

The controlling authorities seem to determine so clearly that a state court has no jurisdiction to pass upon any claim, the validity of which rests upon an interpretation of the tariffs, as to place the question beyond further controversy.

The federal courts say that the purpose of the act to regulate commerce was to secure and preserve uniformity, and the courts

may not, as a general question, exert authorty over subjects which primarily come within the jurisdiction of the commission. *Townes* v. *Lehigh Valley R. R. Co.*, 240 U. S. 43.

The precise question here presented was passed upon by the Interstate Commerce Commission, in the case of *Davis Sewing Machine Company* v. *Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company*, 51 I. C. C. Rep. 192, and was determined adversely to the defendant. The Commission expressly rejects the interpretation of the court in the Joslin-Schmidt case. The Commission says (p. 192) :

"To sustain its contention that the charges resulting from the bunching of the inbound shipments were unlawfully assessed, complainant cites the case of *Joslin-Schmidt Co.* v. *Railway*, 25 Ohio C. C. (N. S.) 379, decided February 28, 1916, and apparently embodying the settled rule of decision in Ohio. That case involved demurrage charges, under the average agreement, on shipments detained at Cincinnati, Ohio, which had been bunched in transit as a result of the flood of 1913. The court, citing the provision, in connection with straight demurrage, exempting a shipper from charges for detention occasioned by bunching of cars 'as the result of the act or neglect of any railroad,' and the further provision that a shipper electing to take advantage of the average agreement should not have the benefit of the exemption, held that only a situation within the terms of the exemption could be affected by the shipper's waiver under the average agreement. Pointing out that the bunching had been the result not of the act or negligence of the carrier, but of an act of God, the court added:

" 'It would be a harsh rule which would relieve one party on account of 'an act of God' and at the same time permit it to penalize the other on account of delay and damage resulting from the same cause.'

"We are unable to adopt the conclusion reached in that case. Under defendant's essentially similar rules demurrage was and is assessable for detention beyond the free time, except that under the straight demurrage arrangement, provision is made for an extention of the free time in case of bunching of shipments through the fault of the carrier, which concession is waived under an average agreement. The rules make no provision for additional free time for car detention on account of bunching resulting from an act of God. For any departure

from those rules defendant would be guilty of a violation of the act.   One of the purposes of the average agreement is, by credits for cars promptly released, to take care of detention caused by bunching and weather interference.   *Alan Wood Iron & Steel Co.* v. *P. R. R. Co.*, 24 I. C. C. 27; *Michigan Mfrs. Association* v. *P. M. R. R. Co.*, 31 I. C. C. 329; *Castner, Curran & Bullitt* v. *P. Co.*, 42 I. C. C. 3.   It would seem to us a strange principle that would permit a carrier to decline, under the average agreement, responsibility for the bunching of cars by its own act or neglect, and at the same time hold it accountable for bunching resulting from no fault of its own.

"We conclude that the charges for the detention which resulted from the bunching of cars after the flood of 1913, lawfully accrued, and that, complainant having declined or failed to pay them, defendant was within its rights in terminating the average agreement."

In *Swift & Co.* v. *Hocking Valley R. R. Co.*, 93 O. S. 143, affirmed by the United States Supreme Court, 243 U. S. 281, it was held:

"Where a demurrage rule, named in the tariff filed by an interstate railroad with the interstate commerce commission and published according to law, has been passed upon and approved by the Commision, acting within the scope of its authority, the decision of that tribunal is binding upon the state courts, and the question of the validity of the rule is not open for consideration in an action brought by the railroad company to recover the charges assessed under the rule as to cars engaged in interstate commerce."

The question again came before the Ohio Supreme Court, in the case of *The Cleveland & Western Coal Co.* v *Pennsylvania Company*, 97 O. S. 161.   The defendant, the Cleveland & Western Coal Company, in that case, admitted the detention of the cars, and the correctness of the claim for demurrage.   The defense was that by virtue of Rule 6 of the tariff, providing that "allowances will be made for railroad errors which prevent proper tender or delivery," the demurrage should be suspended.

"It concedes that in a suit for freight or demurrage charges no counterclaim for damages, either for delayed delivery or damage

to the goods, can be sustained, but it contends that in this case delay in shipment defeats the claim for demurrage.

"The position of the coal company is that it was the duty of the trial court to so construe and apply Rule 6 as to enforce the suspension of the demurrage charges in the manner stated." (p. 163).

This is precisely the state of facts in the case at bar, except that here, the defendant asks that the demurrage be suspended, not by virtue of any express provision of the tariff, but by an implied provision. This is, that in addition to the enumerated grounds for suspension, demurrage should be suspended when it has accrued as the result of an Act of God.

The syllabus in *Cleveland & Western Coal Co.* v. *Penn. Co.. supra*, is as follows:

"Primary jurisdiction having been conferred on the Interstate Commerce Commission to deal with interstate commerce to the extent and in the manner provided for by acts of Congress, state courts have no right originally to exercise authority over subjects which primarily come within the jurisdiction of the commission."

The court says (p. 163):

"The shipments involved in this case were interstate shipments, and jurisdiction to determine controversies arising upon such claims as are set forth here, including the duty and power to construe rules, has been conferred upon the Interstate Commerce Commission by Congress. Equality between shippers in all relations with carriers is the object sought to be attained in the legislation regulating shipments, rates and railroads. It seems to be well settled that the commission has exclusive primary jurisdiction in such matters. Uniform rules and uniform construction of rules are essential to secure the objects sought and to prevent the confusion which would result from one rule being held in one jurisdiction and another rule in another jurisdiction. The courts may not, as an original question, exert authority over subjects which primarily come within the jurisdiction of the Interstate Commerce Commission. (*Tex. & Pac. Ry. Co.* v. *American Tie & Timber Co.*, 234 U. S. 138, and *Tex. & Pac. Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426). Therefore, it having been shown by the agreed statement of facts which was filed

in the case that the claim of the plaintiff of 150 debit days on demurrage account was correct, the courts below were correct in allowing the claim for that amount. The coal company is not without a remedy if it has a legal claim against the railroad company, for the alleged wrongful delays described in its answer, but it must seek its relief in the forum which has been clothed without authority to deal with the subject.''

It would appear, then, that the case of *Joslin-Schmidt Co.* v *B. & O. S. W. R. R. Co., supra,* either must be distinguished as applying only to intrastate shipments, or must be considered as standing alone, and overruled by the subsequent decisions of our Supreme Court.

The court prefers to rest its decision upon the ground that it has no jurisdiction to determine the claim of the defendant herein made.

It does further appear however to the court that, were it considered that an act of God would suspend the running of demurrage, the facts stipulated do not make out a case falling within the principle designated by that term.

The cause of the bunching of the cars here was ''conditions created by the heavy snowfall, severe storms, and protracted, intensely cold weather, in the latter part of 1917, and in January and February, 1918.'' All of the definitions of ''act of God'' include the element that the character of the event must have been such as not to have been within the contemplation of the parties, and which could not have been foreseen by the exercise of reasonable foresight and prudence. 1 Corpus Juris, 1172 *et seq.*

So far as the facts here appear, the conditions set out might have existed when the shipment was made, and it might reasonably have been expected that they would continue the same during the entire time that the cars would be in transit.

The court is therefore of the opinion that judgment should be entered for the plaintiff in the amount claimed, viz., $1,013.52, with interest from March 1, 1918, to April 1, 1921.

Judgment for plaintiff for $1,201.02. Defendant excepts